This is 4-11-0-4-8-7. In re Estate of Kaufman show for the appellant William A. Ellison for the Epley Ralph T. Turner. You are here sir? Okay. Mr. Ellison you may proceed. May it please the court. Counsel. This is of course a will contest. The basic issue raised by the appellant was whether or not the testator understood the effect of his will. There was a trial of course. The court ruled in favor of the defendant obviously. And this appeal of course is followed. Just a word I think about the posture if that's the right word. Our motion at the end of the trial was for a post-trial motion for judgment notwithstanding the verdict. And that's based on the idea that the statement by the court executor was a judicial admission. And if that had been recognized or granted it would have foreclosed any other evidence to the contrary being admitted. And the only judgment that could stand would be in favor of the plaintiff. I think the issue of whether this is an admission and whether it's a judicial admission are probably the first things to talk about. Because if it's not a judicial admission then we're left with arguing it's an admission. Well that's your position is based upon there being the executors. The statement made by one of two co-executors. What if the executor had been the bank? The bank? Yeah. And some officer at the bank testified to the same effect. Would it still be a judicial admission? In fact banks are executors. Oh absolutely. Okay. Would it still be a judicial admission? A bank representative could make a judicial admission. But I don't, unless he witnessed the will or had some relationship with the family beforehand, I don't see how he could make an admission that, a judicial admission that we're talking about in this case. Because it's, this case is based on family. The co-executor talked with her mother who was the spouse of the decedent. But it wasn't the mother's will that's at issue, is it? No, it certainly isn't. It is not. But the statement that she made was the decedent and I had an agreement to leave our farmland to my four children, to the spouse of four children with Vern, and leave a trust for Hazel, my client. In order to answer your question, I think we need to think about, first of all, the Shell versus Weaver case. A hundred years old, but cited in Rennie, and still alive. The administrator stood on the trial in the place of and represented the estate. And while the situation prevented Appley from testifying, of course he was dead, we know of no rule that rendered admissions made to third parties, Biden testifying in his lifetime against his interest to be in Congress. The administrators stood on the trial in the place of and represented the estate. The co-executor, Christine Freshour, says, I believed what my mother said. I believed that there was a trust in both wills. She wasn't just talking about hers. I believed there was a trust in both wills, what her mother said. If she's standing in place of the executor, the decedent, and representing the decedent, as Shell versus Weaver says, she's saying, I believe that there was a trust in both wills. There were only two wills, there was Karen's and Vern's. If she's saying... Well, there was a trust. For Hazel, a trust for Hazel. But she was accurate, it was for Hazel's children. I can't accept that at all. Well, now, it seems to me you're arguing, you have inconsistent positions here. On the one hand, you're arguing that you can't accept that because we have to be very, very precise on what Hazel said and how her understanding of it. Not what Hazel said. Excuse me. You're correct. We're very precise on what she said and her understanding of the trust. But when it came to Vernon, we're real imprecise. He really didn't understand how this all would work. He didn't have an understanding of it. He didn't understand it by the will he drafted. He was essentially disinheriting his daughter. Isn't that your position? It is not. So he did understand he was disinheriting his daughter? They both understood there to be a trust for Hazel in their will. They both understood that. That's what she said. Isn't your position before this court that Vernon didn't understand when he wrote this will? He was disinheriting his daughter. But he didn't understand it. Am I correct, counsel? No. No, you're not. Because they both felt that. The executor is saying her admission was there was a trust for Hazel in both wills. And we agreed to do that. But you have to look at the Cargill case as well. An admission includes not only the words that are spoken, but the facts that it tends to prove. If they both thought there was a trust for Hazel in their will, they both misunderstood the will. I'm not saying that one understood it and one didn't. But they believed that. That is the admission. There's no question. That's an admission. They believed that they had left a trust for Hazel. Well, by itself, I agree that doesn't help much. But those words tend to imply, tend to prove, that they interpreted and misunderstood. So what if Karen simply misspoke, meaning, of course, we left the will, a trust for Hazel's children? I'm sorry? We left the trust for Hazel's children. That's what she really meant. Who meant that? Karen. How do you know that? I'm asking you, what if that's what she really meant? And she was just sloppy in her language. How can I answer that? I wasn't there. I didn't know her. Never mind, counsel. But there is some assistance on this point. The defendant, on page 15 of their brief, admits a good deal of what I've just said. At the bottom of page 15 of their brief, the last paragraph, the second sentence begins. The second sentence begins. It would be the third sentence in the paragraph. Christine Frechdauer believed what her mother was saying. This is the defendant talking now. This is the defendant through their attorneys. The next sentence is what is critical. This indicates Christine Frechdauer believed Karen Kaufman's possible interpretation and understanding of Karen Kaufman's last will and testimony. Now, stop right there. That's Karen's statement. That's what she believed. And the co-executor manifested her belief in that by saying, yeah, that's true. I'll vouch for it. The next step is to look at who is speaking. The speaker is the co-executor, standing in the place of and instead of the deceiver. And, in effect, he's saying, she's right. My wife is right. There's a trust in both wills. And that means that he's saying the same thing. I believed with my interpretation and understanding of Karen's will, just as Karen said. The executor adopted that. I believe there was a trust in my will. It is my understanding and my interpretation of my will that there was a trust for Hazel in my will. If that's true, we win. Whose will are we talking about? Vernon's will. Why do we mention Karen's will? Because the executor, as executor and agent for the estate and standing in his place, makes the admission. I believed what my mother said. My mother said there were trusts in both wills, Vernon's and mine. If she's saying that's true, then one of those trusts, one of those wills had to be Vernon's. And she's saying there's a trust in both, and the executor chimes in and says, on behalf of the estate, standing in the place of the decedent, she's right, I believe it too. That's how you connect Vernon to the estate. His will is through his executor, who Shell v. Weaver says stands in his place and in his stead. Is the will of the wife even in this proceeding? It was introduced into evidence. But recall also that in the statement of the facts, the wills are substantially the same. They're typical estate planning wills. Each had farmland, gave each other life estate, remainder to the kids. This case involved only the estate of the husband? Of Vernon. Correct. I'm sorry. Maybe I didn't understand your question. But the importance of what I'm talking about on page 15 is, this is the defendant saying, this is what the co-executor's statement stands for. First of all, Christine Feshauer believed what her mother was saying. Secondly, this indicates, synonymous with proof, Christine Feshauer believed Karen Kaufman's possible interpretation and understanding of Karen's last will and testament. Again, stop there. They're admitting what her admission tended to prove. It tended to prove that that was her possible understanding and interpretation of the will. Now, enter the co-executor. I've said this before. Standing in place of and instead of the decedent representing him, she's right. Is Karen Kaufman still alive? She pre-deceased Vernon, Your Honor. She pre-deceased him. So her will, apparently, is not a part of these proceedings. Well, I believe it was an exhibit. Marked as an exhibit at the trial. But it's practically identical. It's just a reciprocal, so to speak, one for the other. Was her will ever admitted to probate? Yes. Yes, it was. Go ahead. One other point about this. I think the, as described in Shell v. Weaver, the position of the executor is, or administrator too, is a different kind of vicarious responsibility situation. The executor and the administrator represents the estate, is what I think of first. But they're the only person, here there were two and the other executor has not disavowed what was said here. The executor authorizes what has to be done and actually performs what has to be done. So they're almost a principal and agent rolled into one. Second is the nature of this admission. Rule 801 of the Illinois Rules of Evidence talks about hearsay and admission. It describes in the last paragraph of Rule 801 the different types of admissions that there may be. Also says that, describes what is hearsay. In paragraph 7, I'm sorry, paragraph sub D, 2, B is described what we think is the proper pigeon hole for an executor under these circumstances. Admission by party opponent, I'm reading of course. The statement is offered against the party and is, sub B, a statement which the party has manifested an adoption or belief in its truth. She did that. She did that and they acknowledge that at the bottom of page 15. This is a basic admission. Do the rules deal with what is a judicial admission? No, they don't. That's still going to be according to Illinois law. And the Rennick case is the one that describes what is a judicial admission. Other than the claimed admission you've been describing to us, do you have any evidence at all that you presented to show that Vernon's will did not accurately represent his intent? There was testimony by a doctor, Nord, which I think was ambivalent. Didn't he say he was in good shape physically and mentally? Dr. Nord said several things. Was that one of them? What? That he was in good shape? Physically and mentally. Yeah, sure. But that doesn't tell what his understanding would be of this. Counsel, this would be helpful if you just would answer my question. That was the question I had asked. Didn't the lawyer who drafted the will testify that Vernon understood what the will was about? No, he didn't say that. What he did say was I didn't explain each provision to him. I thought he was competent to make a will. He said that. But he didn't say what you just said. His testimony was ambivalent. So he said he was competent to make a will? Yes, sure. I'm not disputing that. The problem is understanding the effect of the will. So he was competent to make a will, but he didn't understand the will he made. Is that your position? That's correct, yes. That's a separate part of the rules. Jury instructions recognizes that in the cases we've cited. But if there's a judicial admission, it doesn't matter. So other than your claimed admission, do you have any other evidence to show that he didn't understand what his will contained? I don't think so. We had evidence as to his ability to read it, which Judge Pacey said. Judge Pacey said, if you want further evidence, this is a very difficult and complicated will. It's a will which most lawyers wouldn't understand, let alone a layperson. That's what Judge Pacey had to say. It was his finding of fact. So I would suggest that tends to support our position. But I haven't convinced you. I can see that. I don't know what else to do other than to say that the law has changed somewhat as to hearsay and admissions. The nature of the job of the executor is different than any typical vicarious situation. But the executor said, on behalf of the estate, the defendant, she's right. What she says is true. There was a trust in my will for Hazel.  And? There was a trust for Hazel's children, right? Correct. Thank you, Mr. Allison. Your time is up. You have an opportunity to address this again to rebuttal. Mr. Turner? May it please the Court. Counsel. Counsel. Let's go back to your first question, Judge Stegman. If this statement that Mr. Allison claims is a judicial admission was made by anyone other than the executor, his whole argument falls down. So if I was bright enough at the time this started, I would have had her resign as executor and then her testimony would not be a judicial admission. That should not be the policy that the Court adopts. Now, this idea of judicial admission is based on this inference that the statement by the wife can be attached to the husband as if it was his intent and his understanding. There is absolutely no evidence in this proceeding about any statement Vernon Kaufman ever made. There's just this claimed inference because the wills are the same, there was an agreement. And our briefs point out clearly why that logic doesn't work either, because there isn't any binding agreement. At the time this statement was made, both people were alive, both people could have changed their wills, gone to a different structure for their trusts. Now, that to me is very important in this idea of a judicial admission that the executor is supposed to be standing instead of the individual. If Vernon Kaufman made this statement, we have a lot more oomph to the argument that it was judicial admission. Here we have only this inference that is being made. Now, secondly, it doesn't seem to me that you, Judge Steigman, you asked Mr. Allison's question about the inconsistency, that the statement that Christine Freshour made, we're relying upon exactly what she says. But on the other hand, Karen Kaufman, in a very informal conversation, which is reported by Christine, so Karen could have not stated it correctly, i.e., there's a trust for Hazel's family, Christine may not have remembered it correctly, we should not be applying, as Judge Pacey pointed out, this idea of a wordsmith, yes, the lawyer's a wordsmith, and he would describe this as the trust for the family. But a layman shouldn't be charged with that detail and that preciseness when they're describing what's in their will. Now, the second reason this idea of judicial admission doesn't hold up is this claim that Christine has adopted this statement. Now, Christine says, I believe, when my mother said that, I believe that this is what she believed. That doesn't mean it's true. And for a judicial admission, the statement has to be adopted by the person making this statement that was made by another person, as if it was their own. Christine Freschow made it very clear she didn't know what the intent was, she hadn't been told what the estate plan, she hadn't read the wills, so all she was saying is, yes, my mother said this to me, that's all she was saying, and that's all the farther we should make it. But Mr. Allison is trying to take it to the next level, because she's a representative, it has to be true, because she said it. And that's just not the case and should not be the policy and the law. Now, we have this question about Vernon's ability to read. There's no evidence about Vernon's ability to read. The only evidence we have about Vernon's ability to read were from his family to say he read a lot. Yes, he only had an eighth grade education, but he read a lot and he was a very good business person. Even Dr. Nord indicated in his testimony that he had admiration and appreciation for Vernon Kaufman's business acumen. What testimony we do have about reading ability is that a marital deduction will has complicated language in it. Not that Vernon couldn't read it, not that Vernon couldn't understand it, just that it's complicated. It's difficult technical language. And in fact, the testimony of the expert who said, yes, this is difficult language, was I didn't know the person. I don't know his ability to read or his level of knowledge. And Judge Pacey said, we're not going to give any weight to this expert's testimony in deciding this case, as I believe it should be. Did Judge Pacey do all of this simply by statements in court? Testimony in court, yes. Did he make his decision simply by what he said here in this? Yes, he did not reserve a ruling and give us a written ruling. He gave us his ruling from the bench. What did the complaint ask for? It asked for the will to be overturned. And this will contest started as a mental capacity issue and turned into, once Christine reported what her mother said, it turned into a judicial admission. And again, that should not be the law or the policy that we adopt as a state. Now, Mr. Allison does lots of trial work, and he's much more knowledgeable about judicial admissions and the niceties of that than I am. I write a lot of wills. I administer a lot of estates. And I make determinations about people's mental capacity. If we adopt the point of view that Mr. Allison is advocating, we are going to throw this idea of what it takes to have testamentary capacity into disarray. Because under his theory, a statement made by the mother, not the decedent, but the decedent's wife, to an executor that imprecisely describes the trust provisions in the will overturns the mental capacity of the testator. Because by this inference of agreement, and what I said that he didn't understand it either because he and I had this agreement, again, that's going to completely put this issue of testamentary capacity in disarray. Because if we require every testator who does a marital deduction will because they have sufficient wealth to plan to minimize their taxes, require them to understand every one of the provisions in these wills. Well, I'm glad to hear that you do a lot of wills because I wanted to follow up on the answer I thought I received from Mr. Allison, which strikes me as peculiar because I don't have nearly that much experience. But he seems to be establishing a situation in his argument to us. He concedes that the testator here, Vernon Kaufman, had testamentary capacity, but he didn't understand what he would put in his will. And therefore, according to page 8 of the brief, apparently that affects somehow, I think, is the argument is his testamentary capacity and the will should be set aside. This is some kind of new standard, it seems to me, and I'm wondering have you encountered any authority in support of this? That if you have testamentary capacity, there's still a question whether you understand what your will is about. And I don't believe that that's the standard because in my understanding of the standard, did the decedent know the natural objects of his bounty? Did he know the character and extent of his property? And did he have a plan? And Mr. Bach's testimony is very clear. Vernon and Karen had a plan and they told him what they wanted in this will as it related to Peasel. Are you familiar? Mr. Allison cites no case. I agree. I understand that. If there's one here, Mr. Allison, and I missed it, I apologize. You'll get a chance to speak again in rebuttal. But are you aware of any case which stands for the proposition that a testator has testamentary capacity, but his will may still be set aside on a claim he didn't understand what his will contained, which is essentially the argument you just heard. Is there any such case? Not that I know of. I will sit down if you don't have any more questions. Okay. Thank you, counsel. Mr. Allison, rebuttal, sir. Slogar v. Slogar is cited in the points and authorities in our brief. It's cited in the brief. It's cited in the outline. What does it say? I'm sorry? What does it say? Isn't that the standard for testamentary capacity? Pardon me? Isn't the Slogar case set forth the standard for testamentary capacity? I'm about to read that. Okay. Footnotes 3, 4, and 5, head notes. Where a person has sufficient mental capacity to transact ordinary business and act rationally on ordinary affairs, he has sufficient mental capacity. To suffer such incapacity, the testator, at the time he executes his will, must lack sufficient mental capacity to know the natural objects of his bounty, to comprehend the kind and character of his property, to understand the nature and effect of his act. Is there any case that stands for the proposition that a testator has testamentary capacity, but yet his will may be set aside because of a claim that he didn't understand what provisions the will contained? No, but there's plenty of them that say as to each of the other elements, they could be set aside. I don't know why this element should be any different. Did he have testamentary capacity? As to knowing the objects of his bounty? Yes. Making a plan? Yes. But as to this, he did not. I don't know how you can avoid the Supreme Court's decision saying they have to have sufficient capacity to know the nature and effect of the act that they're doing. I don't know how we can ignore that. So then he did not have testamentary capacity. How can we assume that he didn't know what he was doing? First of all, comments to Rule 801, the federal rule. It's had it for a long time. It says, a guarantee of veracity is not necessary if you have an admission. You don't go behind the admission. That person, according to Law v. Sender, 4th District, longstanding, says if you're going to make a statement, you better find out first whether it's true or not. And counsel says, no, I don't like this. Of course they don't like it. But that's what the law is. If you make an admission, you're stuck. Now, they're saying that she didn't adopt this statement. The rule says you can either adopt it or you can manifest a belief in its truth. She said, I believed her. Either one of those is sufficient under Rule 801. They're just misleading you about what the law is. The whole argument is misleading. An admission is an admission. They can't go behind it. This idea about what did she understand, it's what she told her daughter. Her daughter testified to it in a deposition. Her daughter testified to it in open court. And these gentlemen repeated it in their brief. I don't know what else I could do to show you that that was said. It's an admission, and they can't go back on it. Their executive, this idea that she could have resigned, that's baloney. Why? It's baloney because he didn't do it. What if she had? If she made the statement while she was in the course of her duties, you're going to be bound by this because she resigned. What if she never became executive? Then she could have testified and still said what she said. But she did become executive. I don't know why we're talking about that. This lady was abused. Her father sent her away to an orphanage for formative years. Should any of this affect our decision, counsel? Yeah, it should because if there's not a good relationship here, it ain't her fault. Should that affect our decision? I don't know. It depends on your feelings. You as a father could cut out your children in a will for no reason at all. Of course he could. But he did it not knowing that that's what he did in this case. Thank you, counsel.